**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**


| | | |
|---|---|---|
| United States of America, | ) | **CASE NO. 03 CR 01** |
| | ) | |
| Plaintiff, | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| vs. | ) | |
| | ) | |
| Richard B. White, et al., | ) | <u>**Memorandum of Opinion and Order**</u> |
| | ) | |
| Defendants. | ) | |


**<u>INTRODUCTION</u>**

This matter is before the Court upon Defendant Richard B. White's and Defendant

Michael A. Suhadolnik's Identification of Brady Evidence Warranting New Trial (Doc. 315) and

Motion for New Trial, or Alternatively, for Evidentiary Hearing (Doc. 316).  This is a medicare

fraud case.  For the reasons that follow, the motions are DENIED.

**<u>FACTS</u>**

Defendant White was indicted and convicted of fourteen counts stemming from his

involvement in a scheme to defraud medicare.  Defendant Suhadolnik was similarly indicted, but

1

was acquitted of all counts other than wire fraud.  IntegriGuard is the fiscal intermediary[1] for New Hope Community Mental Health Center ("New Hope"), Douglas Mental Health Center ("Douglas") and All Professional Community Mental Health Care, Inc. ("All Professional").  Defendants were charged with committing various acts of medicare fraud involving these three Florida medical clinics.

Both during and after trial, defendants sought information in possession of the government that they claimed established a violation of *Brady v. Maryland*.  This Court rejected defendants' arguments.  Defendants appealed to the Sixth Circuit and, although not concluding that a *Brady* violation occurred, the Sixth Circuit remanded this matter in order to conduct additional proceedings regarding the existence of a potential *Brady* violation.  Defendants traveled to Omaha and reviewed documents in the possession of the government.  They now identify specific documents that they claim establish a *Brady* violation entitling them to a new trial.  The government disputes the existence of a *Brady* violation and argues that the defendants are not entitled to a new trial.  This Court held a hearing on the motion and accepted additional evidence.

The Court will separately address each piece of evidence identified by the defendants.[2]

**ANALYSIS**

---

[1]     Mutual of Omaha acted as the fiscal intermediary prior to IntegriGuard.

[2]     Two motions were filed on this issue.  One is filed on behalf of defendant White only, while the other is filed on behalf of defendants White and Suhadolnik.  Since each motion incorporates the arguments made by the other, the Court will combine the arguments for the sake of clarity.

2

Rule 33 of the Federal Rules of Criminal Procedure permits this Court to grant a new trial "if the interest of justice so requires."  As noted by the Sixth Circuit, however, "[m]otions for a new trial based upon newly discovered evidence are disfavored and should be granted with caution."  *United States v. Turns*, 198 F.3d 584, 586 (6th Cir. 2000).  Ordinarily, a defendant seeking a new trial based on newly discovered evidence must establish the following,

(1) the evidence was discovered after trial;

(2) the evidence could not have been discovered earlier with due diligence;

(3) the evidence is material and not merely cumulative or impeaching; and

(4) the evidence would likely produce an acquittal.

*United States v. Frost*, 125 F.3d 346, 382 (6th Cir. 1997).

However, when the defendant asserts that the new evidence at issue is exculpatory evidence which the government failed to turn over in violation of *Brady*, he 'should not have to satisfy the severe burden of demonstrating that the newly discovered evidence probably would have resulted in acquittal.'  Rather, the defendant must show only that the favorable evidence at issue was 'material' with 'materiality' defined according to opinions interpreting the *Brady* doctrine.

*Id*. at (citations omitted).

Under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  For a *Brady* violation to have occurred, the "evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching...and prejudice must have ensued."  *Spirko v. Mitchell*, 368 F.3d 603, 610 (6th Cir. 2004)(*quoting Strickler v. Greene*,

527 U.S. 263, 281-82 (1999)).  In addition, the evidence must be material to guilt.  *See United States v. Phillip*, 948 F.2d 241, 249 (6th Cir. 1991)(*quoting Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987)).  "Evidence is material 'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"  *Id*.  "A reasonable probability of a different result is...shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'"  *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)(*quoting United States v. Bagley*, 473 U.S. 667, 678 (1985)).

    1.  Program integrity questionnaires

    This first item identified by the defendants consists of Program Integrity Questionnaires.  A program integrity questionnaire is a document consisting of a number of questions to be completed by a field auditor employed by a fiscal intermediary.  In this case, the fiscal intermediary is Mutual of Omaha.  The field auditor indicates whether the auditor believes there was fraud in the underlying audit of a particular facility.  Affirmative responses suggest the existence of fraud.  In this case, Ami Linton, a field auditor for Mutual of Omaha, audited the New Hope clinic for fiscal year 1997.  The audit was completed in January of 1999.  Ms. Linton answered all questions in the negative.  Specifically, defendants point out that Linton responded "no" to all of the following questions,

        •    Was there any provider's concealment of business activities which would affect eligibility for or amount of program reimbursement; e.g., undisclosed change of ownership or undisclosed relationship with a supplying organization?

        •    Was there any billing for supplies or equipment which are clearly unsuitable for the patient's needs or are so lacking in quality or sufficiency for the purpose as to be virtually worthless?

4

- Did the provider have difficulty in obtaining audit evidence with respect to unusual or unexplained [entries], incomplete or missing documentation, or alterations in documentation or account?

Ami Linton also filled out audit questionnaires for the Douglas clinic for fiscal year 1997 and for the New Hope clinic for fiscal year 1998. As with the New Hope fiscal year 1997 questionnaire, Ami Linton answered all questions in the negative.[3]

At the hearing in this matter, the government introduced the audit files containing the Program Integrity Questionnaires. The audit papers are contained in yellow file jackets and are identified with file markings on each folder.[4] In addition to those identified by the defendants, the audit files include Program Integrity Questionnaires for Douglas for the fiscal years 1996 and 1998. These questionnaires were completed by Ami Linton's supervisor, Stephen Shields. Like the questionnaires identified by the defendants, these documents contain negative responses with respect to the question concerning the existence of related parties.

On February 24, 2004, the government's attorney sent the following email to Charles

---

[3]     Defendants also point to a questionnaire completed for New Hope for the fiscal year 1996. In that questionnaire, there was no finding of concealed related party transactions, although some of the questions received positive responses. It is not clear who conducted the audit.

[4]     During the hearing on this matter, defendants argued that the yellow file jackets were not produced in this format during the post-trial document review in Omaha. The government claimed that the exact materials were produced in electronic format during the document review. Because of the dispute, the Court adjourned closing arguments and allowed defense counsel to review the documents in the format introduced at the hearing. After the review, defendants did not point to any additional documents they claim were withheld prior to trial.

5

Potter, an employee of IntegriGuard,

***

I had a question for you.  In the audit workpapers of New Hope for the 97 cost report, there is a document called Program Integrity Questionnaire.  On it, the auditor, Ami Linton, replies negatively to all the questions including the question re were there any arrangements between providers and contractors designed primarily to overcharge the health insurance program.  I asked [one of the testifying auditors] how to rationalize that response with the indications of related party transactions.  He could not explain.  Can you?

In response, Potter sent the following,

I apologize for the delay in responding to your e-mail. I have some ideas as to why the auditor completed the program integrity questionnaire the way she did. I have not reviewed her audit workpapers to make certain that my ideas are valid. She may have completed the questionnaire the way she did because the provider did not submit the documentation that she requested to determine if a related party does or does not exist. She may have come across some information that indicated the existence of a possible related party and she wanted supporting documentation to reflect that the provider reduced the related party charges to cost. If this information was requested and not supplied, then she would have likely completed the questionnaire the way she did. I would need to do a review of the workpapers to determine what the auditor was requesting to determine if that is what caused her to complete it the way she did.

The government's attorney responded to Potter's email, as follows,

Thanks Charles. No problem....  I have to figure out how I can get the workpapers to you or have you look at them here. Cynthia McDonald offered that Ami simply was being conservative if she did not have the evidence to support the allegations of impropriety but that does not square with the later findings and disallowances on failure to document and indications of related parties. In any event, it probably won't affect our case – I hope.

In addition to the government's attorney, defendants point out that other governmental agents knew of Ms. Linton's conclusions.  Defendants point to the following email from an employee of Mutual of Omaha to Charles Potter,

Catherine Hanselman [of the OIG's office] received the information I sent her on [New

6

Hope, Douglas and All Professional] and called asking if she could speak with Ami Linton or Steve Sheilds–they apparently did the audit.

I checked and as far as I can tell neither Any [sic] or Steven still work for the company.

Defendants point out that Catherine Hanselman's interest in investigatng Ami Linton continued into 2002.[5]

Defendants argue that they did not receive this information prior to trial.  According to defendants, it is *Brady* material because it constitutes both exculpatory and impeachment evidence.

Defendants argue that the evidence is exculpatory because the underlying indictments alleged that the Florida clinics improperly received Medicare funds for services provided by related parties.  Defendants claim that Linton's conclusion that there were no indications of related party issues is both material and exculpatory.

Defendants also argue that the material is relevant to impeach two of the auditors who testified against defendants at trial.  Defendants point out that the government relied on Stephen Shields, who testified that for the Douglas clinic for fiscal year 1997, expenses of $1.7 million were disallowed because the expenses were either not related to patient care or lacked appropriate documentation.  He further testified regarding the audit conducted by Mutual of

---

[5]     Defendants argue that a CMS employee told their expert that certain documents were "incriminating" to government officials. The argument is supported by the affidavit of defendants' expert. In response to this argument, the government provides the affidavit of the CMS employee, who denies ever having made such a statement.  Regardless, defendants fail to offer any argument as to how this statement rises to the level of a *Brady* violation.

7

Omaha for the New Hope clinic for fiscal year 1997. Similarly, Cynthia MacDonald testified that for New Hope for fiscal year 1998 there was a lack of documentation and related party issues. Yet, Linton's Program Integrity Questionnaires specifically concluded that there was no indication of related party transactions or lack of documentation for these years.

Defendants point out that counsel for the government discussed with Shields and MacDonald the discrepancies between their conclusions and Linton's findings. Shields could not offer an explanation, while MacDonald thought perhaps Linton was being conservative.

Defendants argue that the government's failure to disclose the existence of the audit reports undermines the confidence in the trial. They claim that withholding evidence that one of the auditors concluded that no fraud existed at two of the three clinics at issue raises a reasonable probability that the result of the trial may have been different.

According to the government, Mutual of Omaha forwarded these materials to HHS at the request of OIG Special Agent Catherine Hanselman, who had undertaken a joint investigation with the FBI and IRS involving Medicare cost reports. The government argues that all of the original work papers, including the questionnaires were made available to the defendants during discovery.

In addition to the testimony of Special Agent Hanselman, the government claims that other materials indicate that the government provided these documents. The government points out that the audit work papers generally contained an index identifying the various work papers supporting the audit. The index for the audit of Douglas for fiscal year 1997, for example, identifies a "Program Integrity Questionnaire." According to the government, a review of the index would have alerted defense counsel to the alleged absence of the questionnaires.

8

Defendants, on the other hand, argue that the fact that the index may reveal the potential existence of the questionnaires does not establish that the questionnaires were in fact produced. According to defendants, the government failed to provide an overall discovery index, exhibit list or correspondence regarding its production of documents.

In the alternative, the government argues that the questionnaires do not establish a *Brady* violation because they are not material.  According to the government, the fact that Mutual of Omaha found no fraud was already available to the defendants.  The Audit Adjustment Report for New Hope for fiscal year 1997 was a government exhibit that made no disallowance based on fraud.  Rather, the auditors disallowed costs on the basis that there was a failure to document the costs claimed.

The government also argues that the documents would not be useful to impeach Shields and MacDonald, the auditors who testified in this matter, because they did not testify regarding their personal knowledge of fraud.  Again, the government argues that the disallowances were made based on a failure to document.  As such, the government claims the audit questionnaires are consistent with the testimony of these auditors.  The government further argues that Linton's own workpapers disallowed over $2.5 million in claimed costs and that she disallowed costs based on failure to document.  According to the government, its case was not dependent on whether the auditors found fraud as the basis for their disallowance.  Rather, the case of fraud through control was established through witnesses other than the auditors, including Feldman and De Varona.  In response to defendants' argument that the questionnaires could be used to impeach Feldman and De Varona, the government argues that the audit adjustment reports indicated that the disallowances were based on failure to document, not fraud.  Thus, the fact that

9

Ami Linton's questionnaires indicated that no fraud was suspected is consistent with the adjustment reports, which were in the possession of the defendants.

In reply, defendants argue that there is a "vast distinction" between a fiscal intermediary not adjusting for fraud in the final cost reports and searching for fraud while auditing the cost reports and concluding that it did not occur.  They further claim that the government's theory of fraud in this case rested on the allegation that defendants duped the fiscal intermediaries by submitting cost reports which concealed the existence of related party transactions.  Thus, although defendants knew that the fiscal intermediaries did not adjust based on related party transactions, they were unaware that the fiscal intermediaries audited the providers relative to the concealed related party transactions and affirmatively concluded that such transactions did not occur.

### A.    Suppression

In order to establish a *Brady* violation, defendants must first demonstrate that the government suppressed the evidence. To support their position that the Program Integrity Questionnaires were suppressed, the government introduced evidence from four witnesses. Henry DeBaggis, Kevin Connors and Jamie Serrat were all involved defense attorneys who participated in the initial trial in this matter.  In addition, defendants rely on the testimony of their expert, Eva Jo Sparks.  Further, defendants introduced a note written by defendant White to his attorney indicating that one file was missing during his own personal review of the government's discovery materials.

In response to these witnesses, the government introduced testimony from FBI Special Agent Fitzgerald and OIA Special Agent Hanselman.  In addition, the government relies on the

10

same note sent from defendant White to his attorney.

Upon review, the Court finds that defendants cannot establish that the Program Integrity Questionnaires were suppressed.  As an initial matter, none of the defense counsel testified that they reviewed all of the documents provided by the government during discovery.  Rather, in varying degrees, each relied on either additional attorneys or paralegals to conduct the document review.  In addition, Mr. Serrat testified that he relied on his client, defendant White, to review many of the documents.  Mr. DeBaggis testified that he simply could not recall whether he saw the Program Integrity Questionnaires during discovery.  Mr. Connors testified that he never saw the Program Integrity Questionnaires at issue.  However, he further testified that he recalls seeing the audit files in a form "similar" to the form introduced at the hearing.  The only way to square his testimony is to accept that the government turned over the files, but removed the particular pages at issue.  That argument, however, has never been asserted by the defendants.

On the other hand, Special Agent Hanselman testified that she in fact provided the audit files in the exact form introduced at the hearing and that the Program Integrity Questionnaires were part of the audit files.  The Court finds this testimony to be credible.

Both sides rely on the note sent from defendant White to Mr. Serrat.  Upon review, the Court finds that the note actually bolsters the government's contention that the Program Integrity Questionnaires were provided.  The note provides as follow,

> Missing: Folder 1 of 3
> New Hope Community Health Center
> 10-4786
> 12/31/98
> Problem Resolution

11

Mutual of Omaha

- - - - - - - - - - - - - - - - - - - -

Box: Douglas/New Hope

Pathways/ 5-00-00232-9

(Def. Ex. 41).

Special Agent Hanselman testified that the information in the note essentially identifies the audit work papers.  Moreover, the Court's own review discloses that the note mirrors the markings on the audit files.  From the note it is apparent that defendants were missing the first of three folders relating to the New Hope Community Center audit for the year ending 1998. Implicit, however, is that defendants received folders two and three regarding this audit.  Not only does the Court accept that these two folders were produced, the Court further finds that the note supports Hanselman's testimony that the audit files for the remaining years were produced in that form.[6]

Eva Jo Sparks, the defendants' expert, testified that she and defendant White reviewed all of the documents produced by the government.  She testified unequivocally that she did not see the Program Integrity Questionnaires.  She further testified that she never saw any of the audit workpapers organized in the manner presented at the hearing.  This testimony, however, is

_____

[6]        The government points out that defense counsel never asked for production of the first file.  Mr. Serrat vehemently argues that he could not have asked for something that was missing, because it is impossible to ask for something you don't even know exists.  The Court notes, however, that Mr. Serrat did know that "folder 1" exists regardless of whether he knew of the specific contents.  The Court is careful to note that defendants were under no duty to file a motion to compel folder 1.  Rather, the Court simply relies on the note to establish that the remaining files were produced.

directly contradicted by the very note defendant White sent to attorney Serrat.  In addition, Ms. Sparks testified that she knew many documents were missing and informed attorney Serrat of this fact.  She also testified that no audit workpapers were provided during discovery and that she was very upset when many of these documents were introduced at trial.  According to her testimony, she was shocked to see these documents for the first time during trial.  The Court finds Ms. Sparks testimony wholly lacking in credibility.  As an initial matter, the Court is confident that if Ms. Sparks told Mr. Serrat that vast amounts of documents were missing and that critical undisclosed documents were introduced during trial, defendants would most certainly have lodged an objection.  Moreover, her testimony is directly contradicted by the note from defendant White, as well as the testimony of Mr. Connors, both of which indicate that the audit workpapers were turned over.

In addition, the government points out that defendants do not dispute that at least certain Program Integrity Questionnaires were produced. Specifically, the government notes that Program Integrity Questionnaires for Douglas for fiscal years 1996 and 1998 were included in the audit files and that defendants do not claim that these particular documents were suppressed. In essence, the government claims that defendants knew that Program Integrity Questionnaires exist for Douglas for 1996 and 1998, yet defendants never questioned whether Program Integrity Questionnaires exist for Douglas for fiscal year 1997 or for New Hope.   The Court agrees with the government that this undercuts the defendants' position.   This is especially so given that the Douglas 1996 and 1998 questionnaires also indicate the absence of related party transactions.[7]

---

[7]     It makes little sense that the government would turn over certain questionnaires that indicate a lack of related party transactions, yet suppress others.

Having carefully reviewed all of the evidence adduced at the hearing, the Court finds that defendants fail to establish that the four Program Integrity Questionnaires were suppressed by the government.

### B. Materiality

Assuming *arguendo* that the government suppressed the Program Integrity Questionnaires, the Court finds that the failure of the government to disclose the four questionnaires was not material. Defendants do not claim that the government suppressed the Program Integrity Questionnaires completed by Stephen Shields, wherein he indicated a lack of related party transactions. Stephen Shields testified at trial, yet the defendants did not cross-examine him regarding the questionnaires. This in and of itself demonstrates that the result of the proceeding would not have been different. Defendants claim that they could have used Ami Linton's responses to impeach the testimony of Stephen Shields regarding the existence of related parties. Yet, they declined to use Shields' *own* questionnaires to impeach his testimony.[8]

Moreover, the defendants called Linton as a witness at this hearing yet were unable to elicit any testimony favorable to the defense. Linton testified that she recalled having difficulty

---

[8]     Defendants point to the email exchange between the government's attorney and Potter, wherein the government expresses concern over Linton's responses. Although the email appears to indicate that the government is "worried" about the questionnaires, thus implying materiality, the Court must perform an independent analysis. Given that defense counsel did not use Stephen Shields' questionnaires to impeach Feldman and De Varona, the Court finds that the result of the proceeding would not have been different had the defendants been in possession of Linton's questionnaires. Other than the identity of the auditor, the evidence is in large part duplicative of the Shields questionnaires, which the defendants possessed.

14

obtaining information during her audits. This is consistent with her ultimate recommendation to disallow costs based on a failure to document. In addition, as set forth below, the government points to correspondence demonstrating that at some point Ami Linton believed related party transactions existed. Thus, her initial responses on the Program Integrity Questionnaires are not sufficient to undermine confidence in the outcome of the trial.      2. Identity of Ami Linton

Defendants also argue that the government failed to disclose the identity of Ami Linton. In support of their position, defendants offer the affidavit of Jamie Serrat, counsel for defendant White, in which he avers that the name Ami Linton was first discovered by defendants during the Omaha document review in late 2007. For the reasons set forth above, the defendants claim that the government's failure to disclose Ami Linton's identity constitutes a violation of *Brady*.

In response, the government points out that it introduced a number of exhibits at trial that expressly identify Ami Linton as the auditor for various audits, including the 1997 New Hope audit and the 1998 New Hope audit. In addition, Linton's initials appear on numerous documents introduced by the government. As such, the government argues that Serrat's affidavit is clearly erroneous.

The government further argues that Ami Linton's testimony would have been consistent with that of the other auditors. In addition, the government points out that an attorney for Douglas sent Linton a letter contesting her findings that there were related party issues. As such, the government claims that Linton must have taken the position that related party issues were relevant to Douglas. The government argues that the evidence at trial was overwhelming that White and De Varona "controlled every aspect of finances of Douglas (and the other Medicare providers) to enable them to establish inflated consulting contracts at the expense of Medicare."

15

Upon review, the Court finds that, for the reasons states above, the failure of the government to disclose the identity of Ami Linton does not amount to a *Brady* violation.  As an initial matter, the Court finds that the government did not suppress the Ami Linton's identity. Ami Linton's name appeared on her own questionnaires and also appeared on trial exhibits that defense counsel undoubtedly possessed.  Moreover, as set forth above, even if Linton's identity was suppressed, the Court concludes that the result of the proceeding would not have been different and confidence in the outcome exists.

3.  Charles Potter's role

Defendants also argue that the government misrepresented the role Charles Potter played in this case.  Specifically, defendants point out that the government claimed Potter was a potential expert witness and was used only "from time to time" as a "sounding board." Defendants further point out that the government indicated that it did not ask Potter to review evidence and that there was only a "slight chance" that Potter would be called to testify as an expert.  Contrary to the government's position regarding Potter, defendants claim that they have discovered documents indicating that Potter's role in the investigation of this case was far more significant than the government led on.

The defendants identify a handwritten notation on a Fraud Referral Entry Form indicating that Potter had files for Douglas and New Hope in his possession as early as 1999.  In addition, on October 23, 2001, the OIG requested that Potter send it files pertaining to the Florida clinics. According to defendants, files were sent from Mutual of Omaha to the OIG.  Defendants also point out that the government's attorney discussed Ami Linton's findings with Potter.

Defendants also argue that documents indicate that the government greatly

16

underestimated the likelihood that it would call Potter as a witness in this case.  In support of

their position, defendants point to three emails.

The first is an email from Potter to the government's attorney, which provides,

I just received a telephone call from an attorney indicating that he was representing the
defendant that you are prosecuting. He stated that he had gotten my name from a brief the you
had written and that you were not planning on utilizing me in the trial. He wanted to
know if I had reviewed the documents and had written a report. I told him that my staff
had gathered the files and had sent them to Mr. Lynch's office. I did not write a report. I
suggested that he give you a telephone call.

The government's counsel responded as follows,

I hope your hearing went well. I am attaching for your comments the defendant's 'expert'
report re Medicare provisions. I think it will be relatively easy to attack. Let me know
your ideas. PS. Cynthia MacDonald is thankfully now available to use so we are in good
shape with both Stephen and Cynthia.

The expert report sent by the government to Potter consisted of an altered version of the

report drafted by defendants' expert.  In response, Potter emailed a critique of the report to the

government.

On March 24, 2004, government counsel wrote to Potter, indicating as follows,

Charles, just a short note to let you know that all of the FI reps testified very well and it
will not be necessary for you to be called as a witness. You have been ver;y [sic]
genorous [sic] with your time and sharing your thoughts. It has been a great comfort for
me to have you as my standby and my source of knowledge. I will try to call you and
discuss this further because I may want to "pick your brains" some more over this so
called expert the defense is expecting to call. Is there a number I can reach you over the
week end or in the evenings? We expect to rest by noon Friday and then the defense may
begin with their expert.

Defendants argue that these emails demonstrate that the government misrepresented

Potter's role in this matter.  According to defendants, Potter was an active investigator who

17

reviewed files and evidence.  He also had knowledge of Linton's conclusions.  Defendants argue

that the government misled the defense by misrepresenting Potter's role in this case.  As such,

the government violated *Brady* and infringed upon the defendants' right to a fair trial.

In response, the government indicates that Potter was made known to the defendants on

numerous occasions and that proper notice was provided.  According to the government, the

Court should reject defendants' assertion that a *Brady* violation occurred because Potter was a

"fact witness" as opposed to an "expert witness."  The government claims that it "defies logic"

that Potter would be unfamiliar with the facts of this case, given the government's indication that

he would likely testify as an expert.

In reply, defendants claim that they are not arguing that the notice was insufficient.

Rather, they claim that the government intentionally underplayed the role Potter had in this

matter.  According to defendants, Potter oversaw Mutual of Omaha's Benefit Integrity Unit at

the time the audits were conducted.  He supervised Shields and MacDonald, who conducted the

field audits of the providers.  Defendants argue that the government cannot reconcile why the

employees were identified as "fact witnesses," while their supervisor was identified only as an

expert.  Defendants claim that the witness disclosure mischaracterizes Potter as an expert, when

in fact he had an active role in the underlying investigation.

At the hearing in this matter, it became apparent that defendants' true argument lies in the

fact that the government "tricked" defendants and the Court by eliciting expert testimony from

Shields and MacDonald in violation of the Court's order that experts would not be permitted to

testify absent a report.  Mr. Serrat indicated that had he known that the government would act as

such, he would have obtained his own medicare expert.  In response, the government points out

18

that the defendants' expert did in fact testify regarding medicare issues, including her belief that no related party transactions occurred.  In addition, the government called Potter as a witness at the hearing.

Upon review, the Court finds that, even assuming the government mischaracterized Potter's role in this matter, no *Brady* violation occurred.  Simply put, the defendants failed to elicit any favorable testimony from Potter.  Moreover, the Sixth Circuit expressly addressed the elicitation of expert testimony through Shields and MacDonald.  In any event,  the Court would have precluded Potter from testifying absent a written report.

4.  The Douglas attorney correspondence

Douglas's 1997 field audit ultimately resulted in initial disputes between Mutual of Omaha and Douglas regarding the existence of related party transactions.  Douglas retained an attorney who sent lengthy correspondence to Ami Linton, outlining its position that Douglas and the suppliers run by White were not related.  The attorney's letter was referred to another auditor.  All of the information was reported for review by an audit supervisor.  The review was arranged by Potter.   Following this review, an audit adjustment report was issued, which, although making adjustments, made no adjustments for related parties.[9]  This second report was introduced at trial by the government.  Defendants, however, claim they were not made aware of the prior correspondence and documentation indicating that Mutual of Omaha and Douglas were disputing whether related party transactions had occurred.  According to defendants, this

---

[9]       Douglas appealed the audit adjustment report to the Medicare
         Provider Reimbursement Review Board.  In response to the appeal,
         Mutual of Omaha did not raise any related party issues.

evidence demonstrates that Douglas was not fraudulently concealing the existence of related party transactions.

Defendants argue that they would have used these documents to impeach Raul Sanchez De Varona's testimony regarding "knowingly" entering into a conspiracy with defendant White to obscure related party transactions.   According to defendants, the correspondence filed on behalf of Douglas impeaches the testimony of De Varnoa that he knew in 1997 that the suppliers were "related through control."  In addition, defendants argue that the evidence could have been used to impeach the testimony of Corpas and Alfonso concerning whether there was an agreement to intentionally violate Medicare regulations.

The government does not directly address this argument in its brief.  At the hearing, the government argued that the evidence of related party transactions was overwhelming and that the attorney correspondence could not have been used at trial.

 The government does not dispute that these materials were suppressed.  Thus, the Court need only determine whether the evidence is favorable and material.  As an initial matter, the Court notes that an attorney's position on behalf of its client is not "evidence" as to whether related party transactions occurred.  Thus, the evidence is not exculpatory.  Although  the evidence may be to some degree impeaching, the Court finds that the  failure of the government to provide the evidence does not undermine confidence in the outcome.  Although De Varona, through his attorney, denied the existence of related party transactions early on, he testified extensively and in great detail regarding the control issues.  Given his detailed testimony, a

general denial of liability[10] is not sufficient to undermine confidence in the outcome of the trial. In addition, the government provided testimony from Corpas and Alfonso.  In light of the testimony, the Court finds that the failure of defendants to disclose that De Varona, through his attorney, initially attempted to avoid liability for the existence of related party transactions, does not rise to the level of a *Brady* violation.

### **CONCLUSION**

For the foregoing reasons, Defendant Richard B. White's and Defendant Michael A. Suhadolnik's Identification of Brady Evidence Warranting New Trial and Motion for New Trial, or Alternatively, for Evidentiary Hearing are DENIED.

The parties are to submit briefs on the loss issue.  Initial submissions are due on or before September 1, 2008. Opposition briefs are due 30 calendar days thereafter. Reply briefs are due 10 calendar days after the submission of opposition briefs.

IT IS SO ORDERED.


 /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge


Dated: 7/16/08

---

[10]     The Court notes that De Varona's plea agreement was entered into evidence.  Thus, the jury knew (or could have known through defendants' questioning) that De Varona initially denied the existence of related party transactions.

21